UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| I.R.L.M.,<br><br>Petitioners,<br><br>v.<br><br>ANGIE SALAZAR, Acting Director of the Office of Refugee Resettlement, et al.,<br><br>Respondents. | Case No. 5:26-cv-04335-DTB<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

**I.**

**PROCEDURAL HISTORY**

On July 31, 2026, petitioner I.R.L.M., a minor by and through Erica Santamaria, as Next Friend of Minor ("Petitioner"), represented by counsel, filed a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition") (Docket No. 1), accompanied by the supporting Declaration of Erica Santamaria ("Santamaria Decl.") (Docket No. 1-1).

/ / /

/ / /

On the same date, Petitioner filed an Application to Proceed by Pseudonym and an Application for Appointment of Guardian ad Litem (collectively "Applications") (Docket Nos. 3-4), which the Court granted on August 6, 2026 (Docket Nos. 12-13).

On August 11, 2026, (in accordance with General Order 26-05's expedited briefing schedule, see Docket No. 7), Respondents filed an Answer to the Petition ("Answer") (Docket No. 14), accompanied by the Declaration of Elizabeth Kronk (Docket No. 14-1).

On August 14, 2026, Petitioner filed a Reply (Docket No. 15), accompanied by the supporting Declaration of Marion Donovan-Kaloust (Docket No. 15-1).

On August 24, 2026, the Court held a status conference. (Docket No. 20). Emily Sugarman, Esq. and Cynthia Felix, Esq., both of Immigrant Defender's Law Center, appeared remotely on behalf of Petitioner. Aaron Kollitz, Esq., of the United States Attorney's Office, appeared remotely on behalf of Respondents.

At the status conference, Respondents' counsel confirmed that four issues remained outstanding for purposes of Petitioner's release to the identified primary sponsor, his mother, F.M.D.: (1) The issuance of the Division of Vetting report ("DOV"); (2) the completion/return of a child abuse and neglect ("CA/N") background check; (3) DNA testing results; and (4) confirmation of background checks on the cohabitants in F.M.D.'s home. At the status conference, it was confirmed that a home study assessment for had been completed, and that the recommendation was positive. On August 26, 2026, Petitioner filed a Status Report (Docket No. 21), accompanied by an exhibit (Docket No. 21-1) and the Declaration of Emily Sugarman (Docket No. 21-2).

Also on August 26, 2026, the Court held a second status conference. (Docket No. 22). During the second status conference, Respondents' counsel confirmed that the background checks on the cohabitants had been completed with no issues

identified. However, Respondents' counsel stated that the DNA testing had not been completed, and Respondents' counsel indicated that it was estimated that the CA/N check would not be received for another thirty days because the Office of Refugee Resettlement ("ORR") was waiting for a response from its state and local partners for purposes of confirming that there were no "open investigations" regarding any of the inhabitants at the sponsor's home. The Court expressed its concern regarding the delay in releasing Petitioner into the custody and care of his mother, F.M.D., given the positive recommendation of the home study assessment and the clear background and fingerprint checks for all of the inhabitants of the identified home (F.M.D. and her partner, S.Z.P., and their children, three of whom are minors). The Court noted that the home study did, apparently, identify an incident whereby local child welfare officials had been called to the home of F.M.D. and, as a result of that incident, S.Z.P. had been required to complete a domestic violence education program, however there was no evidence that any criminal charges had been filed as a result of that incident or that it raised any concerns regarding the safety and well-being of Petitioner (or of any of the other children in F.M.D.'s home), particularly since the same home study in which that incident was identified provided a positive referral and recommended that Petitioner be placed with his mother in the home. While Petitioner's counsel requested that the Court order Petitioner's release, the Court declined to do without further briefing. Accordingly, the Court ordered the parties to file supplemental briefs no later than August 28, 2026, if they wished to make any further argument on the Petition, and also ordered Respondents to file, under seal or in camera, a copy of the home study assessment with the Court. (Docket No. 22). The Court indicated that it would adjudicate the Petition if Petitioner was not released by Friday, August 28, 2026. (Id.).

/ / /

On August 27, 2026, Respondents filed the home study assessment ("Home Study") under seal. (Docket No. 23-1).

On August 28, 2026, Petitioner filed a Supplemental Brief in support of the Petition (Docket No. 24), accompanied by the Declaration of F.M.D. ("F.M.D. Decl.") (Docket No. 24-1), the Declaration of S.Z.P. ("S.Z.P. Decl.") (Docket No. 24-2), and an exhibit (Docket No. 24-3).

Respondents did not file a supplemental brief.

Thus, this matter is now ready for decision. For the reasons set forth below, the Court grants the Petition.

## II.

## BACKGROUND[1]

Petitioner is a 15-year-old child who entered the United States on or about January 13, 2026. (Petition at ¶ 21). On January 15, 2026, he was designated as an unaccompanied child ("UC") and entered ORR custody. (Id.). During his detention, Petitioner was initially placed at New Life Foster Family Agency in Colton, California, and was later transferred to A Greater Love Foster Family Agency in Ontario, California. (Id.).

Petitioner seeks reunification with his mother, F.M.D., who resides in California and is willing and able to care for him. (Id. at ¶ 22).

On January 17, 2026, ORR initiated the reunification process by referring Petitioner's case for sponsorship processing through his maternal aunt, the initial proposed sponsor. (Id. at ¶ 23).

/ / /

/ / /

/ / /

[1] The Background is taken primarily from the Petition.

As the initial proposed sponsor, Petitioner's aunt submitted identification documents, birth certificates, proof of address, and income information. (Id. at ¶ 24). By January 21, 2026, Petitioner's birth certificate had been submitted for verification. (Id.).

On February 17, 2026, ORR documented that Petitioner's aunt had submitted required documents, including identification, birth certificates, proof of address, and income information. (Id. at ¶ 25).

Weeks passed with little apparent progress toward reunification. (Id. at ¶ 26). On February 19, 2026, ORR reported that the sponsor assessment remained pending. (Id.). Similar updates followed on March 4, March 11, and March 19, 2026. (Id.).

During this same period, Petitioner appeared increasingly distressed by the lack of progress toward reunification. (Id. at ¶ 27). On March 18, 2026, ORR staff reported that Petitioner had been crying in the classroom and had been expressing that he did not want to remain at the facility anymore. (Id.). Later that month, Petitioner became tearful and visibly upset while discussing the length of his detention and the lack of progress toward reunification. (Id.).

In approximately early March 2026, ORR shifted sponsorship processing from Petitioner's aunt to Petitioner's mother, F.M.D. (Id. at ¶ 28). ORR records state only that Petitioner's case had originally been opened with the aunt and that she "will not be sponsoring." (Id.). The records do not reflect a formal denial of the aunt's sponsorship application, a written explanation for the change, or any indication that the aunt withdrew her request to sponsor Petitioner. (Id.).

On March 23, 2026, ORR scheduled fingerprinting for F.M.D. (Id. at ¶ 29). F.M.D. completed fingerprinting the following day and thereafter continued responding to ORR's requests for documents and information relating to the sponsorship process. (Id.). F.M.D. is a lawful permanent resident. (F.M.D. Decl. at ¶ 1).

On March 25, 2026, during a wellness check conducted by Immigrant Defender's Law Center staff, Petitioner stated that he felt he had spent too much time in ORR custody and expressed frustration with how long the reunification process was taking. (Petition at ¶ 30). While discussing the delay and the lack of apparent progress toward reunification, Petitioner became tearful and visibly upset. (Id.). Petitioner explained that the primary issue affecting him was the amount of time he had spent in ORR custody waiting to reunify with his family. (Id.).

On April 8, 2026, ORR reported that it could not yet request a home study for F.M.D. because reunification requirements and background check requirements had not been completed. (Id. at ¶ 31).

On April 28, 2026, ORR reported to Petitioner's counsel's office that Petitioner remained pending reunification with his mother and that reunification documents remained outstanding. (Id. at ¶ 32).

Throughout the spring and summer of 2026, ORR continued requesting and processing additional materials relating to the proposed sponsor and other adults connected to the proposed placement. (Id. at ¶ 33). ORR records reflect requests for Authorization of Release of Information forms, address histories, household-composition information, proof-of-identity materials, proof-of-income documentation, and background-screening information. (Id.). F.M.D. continued to respond to ORR's requests and continued to provide information and documentation throughout the reunification process. (Id.).

On May 27, 2026, during a wellness check conducted by Immigrant Defender's Law Center staff, Petitioner reported that he continued speaking with his mother every day. (Id. at ¶ 34).

On May 28, 2026, F.M.D. informed ORR that her partner and adult daughter had recently moved into the household. (Id. at ¶ 35). ORR then requested additional

documentation and screening information relating to those household members. (Id.).

On June 8, 2026, ORR informed F.M.D. that additional proof-of-income documentation was required. (Id. at ¶ 36). F.M.D. explained that she had recently started a new job and, therefore, had only one pay stub available. (Id.).

Reunification updates provided to Petitioner's counsel on June 23, June 25, and July 9, 2026, continued to characterize the sponsorship process as pending and unresolved. (Id. at ¶ 37). Despite months of sponsorship processing involving both Petitioner's aunt and later Petitioner's mother, those updates reflected that Petitioner remained in custody without reunification or any final determination regarding sponsorship. (Id.).

As of July 8, 2026, ORR reported that the Family Reunification Packet remained pending, DNA testing remained pending, proof of income remained pending, and a home study had not been completed. (Id. at ¶ 38).

Throughout the reunification process, ORR repeatedly documented that F.M.D. did not present a risk of abuse, maltreatment, exploitation, or trafficking to Petitioner. (Id. at ¶ 39).

Petitioner's prolonged detention has taken a substantial emotional toll on him. (Id. at ¶ 40). ORR records consistently reflect the importance of family reunification to Petitioner and his desire to live with his family in California. (Id.). The records document Petitioner's excitement regarding communication and visits with family members, including siblings whom he had not seen in several years. (Id.). During a May 27, 2026 wellness check, Petitioner again reported that he continued speaking with his mother every day. (Id.).

Petitioner has struggled during his lengthy stay in ORR custody. (Id. at ¶ 41). ORR records document that Petitioner has had recurring headaches and reflect that Petitioner has had difficulties adjusting to placement while separated from his

family. (Id.). Petitioner reported feeling unwelcome by other children in care. (Id.). These experiences have compounded the emotional strain associated with prolonged separation from Petitioner's family and continuing uncertainty regarding reunification. (Id.).

Petitioner's counsel sent a demand letter requesting Petitioner's release on July 14, 2026, but did not receive any response. (Id. at ¶ 42).

As of July 31, 2026, Petitioner remained continuously in ORR custody for nearly 200 days and separated from his family for nearly seven months. (Id. at ¶ 43). Throughout that time, family members have actively participated in the reunification process, first through Petitioner's maternal aunt and later through Petitioner's mother. (Id.). Yet reunification remains incomplete, and Petitioner remains in government custody. (Id.).

On August 18, 2025, ORR completed the Home Study for Petitioner's case. (Docket No. 23-1 (under seal)). The Home Study, which is 60 pages in length, provides a comprehensive analysis of Petitioner, his health and history, as well as that of his identified sponsor, F.M.D., all individuals who will reside in the family home with Petitioner, including F.M.D.'s three minor children, ages 7, 11, and 12, and Petitioner's 22-year-old sister (F.M.D's daughter).. (Id. at 47-55). The Home Study included a site visit to F.M.D.'s home on August 2, 2026. (Id. at 16). F.M.D. lives with her partner of approximately 14 years, S.Z.P., and they have 3 children together. (Id. at 20). Amongst other things, the Home Study details an incident which occurred in 2024, when the Department of Family and Children's Services ("DFCS") visited the home after a report of a verbal altercation between F.M.D. and S.Z.P. (Id. at 18). As a result of the visit by DFCS, S.Z.P. was required to attend a 10-week counseling session on marital communication and domestic violence, which he completed in May 2025. (Id. at 58). During the Home Study visit, F.M.D. provided S.Z.P.'s certificate of completion of the 10-week counseling program to

the investigator. (Id.). No charges were ever filed with respect to the incident. (F.M.D. Decl. at ¶ 9). During the site visit, the investigators evaluated the environment for purposes of familial health, emotional and financial support, and reported positive responses for each category of inquiry. (Docket No. 23-1 at 16-55). The Home Study ultimately concluded with a positive endorsement, finding that Petitioner will benefit from residing in the home with his mother, F.M.D., where there is an established support system, a unanimous desire for reunification, and a willingness to provide emotional, moral, practical and financial assistance. (Id. at 55). In the Home Study, it was noted that several of the household members, including S.Z.P.,F.M.D., and Petitioner's sisters, reported having ongoing communications with Petitioner on a frequent basis, and that the reunification is expected to provide Petitioner with the opportunity to strengthen family relationships, pursue an education, access necessary healthcare and community resources, and develop within a supportive and stable family environment. (Id. at 55-56).

## III.

## PETITIONER'S CLAIMS

The Petition alleges the following claims for habeas relief: (1) Petitioner's detention violates the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232; (2) Petitioner's detention violates his right to substantive due process under the Fifth Amendment of the Constitution; and (3) Petitioner's detention violates his right to procedural due process under the Fifth Amendment of the Constitution. (Petition at 25-29).[2]

/ / /

/ / /

[2] Citation to the parties' pleadings shall refer to the Court's CM/ECF pagination at the top of the page.

## IV.

## LEGAL AUTHORITY

A writ of habeas corpus is "available to every individual detained within the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973). A court may grant a writ of habeas corpus to a petitioner who demonstrates to be in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Traditionally, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." I.N.S. v. St. Cyr, 533 U.S. 289, 301 (2001). A noncitizen in the custody of immigration authorities may bring a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on the grounds of their detention violates the Constitution or other federal laws. 28 U.S.C. § 2241(c)(3); Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001) (federal courts retain jurisdiction to consider habeas relief under Section 2241 for noncitizens subject to detention following an order of removal).

## V.

## DISCUSSION

### A. Legal Framework Applicable to Unaccompanied Minors

The custody, care, and welfare of unaccompanied immigrant children entering the United States is subject to a discreet body of law which is different in many important respects from the legal authority governing adult undocumented immigrants.

In 2002, Congress enacted the Homeland Security Act, 6 U.S.C. § 279 ("HSA") which abolished the Immigration and Naturalization Service ("INS") and transferred responsibility for the care and placement of minors from the INS to the

ORR, an office within the Department of Health and Human Services. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2); Singh v. Stevens, 821 F. Supp. 3d 898, 903(N.D. Ohio 2026). Congress subsequently passed the TVPRA to prevent trafficking of any unaccompanied alien child ("UAC") in the United States and ensure safe return to their country of nationality or last habitual residence. 8 U.S.C. § 1232(a)(1). The HSA defines an UAC as "a child who – (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

"The detention of unaccompanied alien children is governed by the TVPRA, which does not mandate detention." Singh, 821 F. Supp. 3d at 903 (quoting R.D.T.M. v. Wofford, Case No. 25-cv-01141, 2025 WL 2686866, at *4 (E.D. Cal. Sept. 18, 2025)). Instead, the TVPRA requires that ORR place an UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). ORR may consider, *inter alia*, whether the UAC poses a danger to himself, the community, or is a flight risk. Id. Removal proceedings commence after the UAC is in ORR custody. 8 U.S.C. § 1232(a)(5)(D).

Pending removal, ORR may release an UAC to an approved sponsor that is "capable for providing for the child's physical and mental well-being" by determining, "at a minimum … verification of the [sponsor's] identity and relationship with the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). A home study must be completed under certain circumstances, such as when an UAC "is a victim of a severe form of trafficking in persons." 8 U.S.C. § 1232(c)(3)(B).

/ / /

In April 2024, ORR implemented the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), 45 C.F.R. Part 410, which similarly required ORR to place an UAC in the least restrictive setting that is in the best interest of the child. 45 C.F.R. § 410.1103(a). ORR published policies and procedures that govern suitability assessments of potential sponsors that provided additional details on the sponsorship process. See ORR UAC Bureau Policy Guide ("UAC Policy Guide"), §§ 2.2, 2.4-2.5, https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

Pursuant to the UAC Policy Guide, potential sponsors must provide documentation of their identity, address, relationship to the child they seek to sponsor, proof of income, and proof of social security number or individual taxpayer identification number. Id. at § 2.2.4. To do so, potential sponsors must follow specific criteria, including presenting acceptable identification documents and undergoing a background check to prove their identity, submitting a DNA test to prove their relationship to the UAC, interviews, and in some cases, a home study to confirm their suitability as a sponsor. Id. The Foundational Rule requires ORR to adjudicate completed sponsorship applications from close relatives, such as parents or legal guardians, within ten days, unless the case involves an unexpected delay, such as the need for a home study. 45 C.F.R. § 410.1205(b).

2. Analysis.

a. Procedural Due Process

In the Petition, Petitioner contends that Respondents' delay in approving F.M.D.'s sponsorship application deprives Petitioner of his fundamental interests in freedom from detention and family integrity in violation of his right to procedural due process. (Petition at 21-25, 27-29).

In the Answer, Respondents deny that Petitioner's procedural due process rights have been violated and contend that Petitioner's continued detention is

required in order to ensure his safety and well-being. (Docket No. 14 at 2, 18, 24). Respondents argue that it is F.M.D., not Respondents, who has delayed the process of reunification by submitting incomplete paperwork, and that further background procedures remain outstanding which prevent a final determination that F.M.D.'s household is a suitably safe and secure environment in which to release Petitioner. (See, e.g., id. at 24).

Notwithstanding Respondents' argument, there is no dispute that the following requisite steps have occurred: The proposed sponsor, F.M.D., has actively sought reunification with her son, Petitioner, and has provided a completed sponsorship application (see, e.g. Docket No. 21 at 1-2); ORR has obtained fingerprint results from all of the adult cohabitants of F.M.D.'s household – the home where Petitioner is intended to reside – and all have returned "clear" (id. at 3); ORR has verified the parental relationship between Petitioner and F.M.D., and has received Petitioner's birth certificate, which has been confirmed by the Mexican Consulate (id. at 2); Petitioner and F.M.D. have participated in family therapy together as part of the reunification process (id.); and a Home Study has been completed with a positive recommendation (id. at 4). Other than the mere fact of pendency of the outstanding ORR DOV report and the CA/N check, Respondents have not pointed to any particularized, identifiable, cognizable risk or threat to Petitioner's health or welfare, or to any risk of flight, such that his continued detention would be warranted under the TVPRA.

The Fifth Amendment provides that "no person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). To determine whether a due process violation exists, the Court must apply the balancing test set forth in Mathews v.

Eldridge, 424 U.S. 319 (1976). See Escobar-Ruiz v. Raycraft, Case No. 1:25-cv-1232, 2025 WL 3039255, at *6 (W.D. Mich. Oct. 31, 2025) (citing United States v. Silvestre-Gregorio, 983 F.3d 848, 852 (6th Cir. 2020)) (applying the Mathews balancing test to immigration detention)). Under the Mathews framework, the Court must consider: "(1) [T]he private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest [and the value of any additional or substitute procedures]; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures entail." Singh, 821 F. Supp. 3d at 910 (citing Escobar-Ruiz, 2025 WL 3039255, at *6). Having considered the underlying facts, the Court finds that all three Matthews factors weigh in favor of Petitioner, indicating that Respondents have violated his right to procedural due process by continuing to detain him rather than releasing him to his mother.

*i. Private Interest Affected by Official Action*

Petitioner argues that Respondents' conduct infringes on two private interests: Petitioner's interest in freedom from detention, and his interest in family integrity. (Petition at 21-24, 28).

*a. Freedom from detention*

Petitioner argues that he has a substantial liberty interest in freedom from detention regardless of immigration status.

In the Answer, Respondents argue that Petitioner does not have an interest in freedom from confinement because "juveniles, unlike adults, are always in some form of custody"(and, therefore, when a parent or guardian is unable or unwilling to take custody of a minor, the "government may (indeed, we have said must) either exercise custody itself or appoint someone else to do so." (Docket No. 14 at 17) (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).

/ / /

Respondents' reliance on Flores is misplaced. In Flores, the Supreme Court held that "[w]here a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child, and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution." Flores, 507 U.S. at 303. Flores "concerns UACs who are (1) detained for the first time and (2) do not have a readily available parent, close relative, or legal guardian to take custody of them." A.N.P.S. v. Salazar, Case No. 25-cv-14778, 2025 WL 3707333, at *7 (N.D. Ill. Dec. 22, 2025). That is not the circumstance at hand. Here, Petitioner's mother, F.M.D. has been seeking custody of him for approximately six months and has doggedly pursued reunification with her son. Thus, it seems that "*Flores* thus says little if anything about what procedural due process someone in Petitioner's circumstances must be afforded, and it certainly does not hold that a UAC may not obtain due process under the *Mathews* test[.]" A.N.P.S., 2025 WL 3707333, at *7.

Indeed, "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the very liberty that [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690. Freedom from detention is one of the "most elemental of liberty interests." Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004). Although minors, unlike adults, are "always in some form of custody," minors still "retain a strong interest in being free from unnecessary government interference with their liberty." Saravia v. Sessions, 280 F. Supp. 3d 1168, 1195 (N.D. Cal. 2017), *aff'd sub nom.* Saravia for A.H. v. Sessions, 905 F.3d 1137 (9th Cir. 2018) (citing Schall v. Martin, 467 U.S. 253, 265 (1984)); J.E.C.M. v. Marcos, 689 F. Supp. 3d 180, 195, 198 (E.D. Va. 2023) (explaining that age "does not negate a minor's interest in being free from restraints").

Several courts have found that, at least when a parent is requesting reunification, the burden should be on ORR to show why continued custody of the

child is appropriate, rather than placing the burden on the parent. See Santos v. Smith, 260 F. Supp. 3d 598, 613 (W.D. Va. 2017) ("[W]hen a parent is requesting reunification, the burden should be on ORR to show why its continued custody of a UAC is appropriate, rather than placing that burden on the parent."); Beltran v. Cardall, 222 F. Supp. 3d 476, 485 (E.D. Va. 2016) (finding sponsorship process inadequate because "[a]t no point was the onus on ORR to justify its deprivation of Petitioner's fundamental parental rights"). This is particularly true when the child was living with the sponsor prior to detention. See E.H.C.F. by Contreras Flores v. Kennedy, Case No. 3:25-cv-2142, 2026 WL 145229, at *12 (D. Conn. Jan. 16, 2026) ("In this case, the Court agrees that ORR's procedures improperly place the burden on Ms. Contreras Flores, especially in light of the uncontested fact that E.H.C.F. was living with her prior to his arrest.").

Here, Petitioner, even as a non-citizen, has a private interest in freedom from detention. Petitioner's mother, F.M.D., has complied with each of ORR's requests to determine her current sponsorship suitability, has submitted a completed sponsorship application, has confirmed that neither she nor anyone in her household has any criminal history, has confirmed that she has the emotional and economic ability to care for Petitioner, and has received a positive home study recommendation, all in compliance with the governing authority of the TVPRA. Nonetheless, nearly eight months after Petitioner's detention, Respondents maintain that the vetting process is ongoing, but have proffered no adequate justification to continue detention. Thus, Petitioner has a private interest affected by official action. See Santos, 260 F. Supp. 3d at 613.

*b. Family Integrity*

Petitioner asserts an interest in family integrity. Petitioner argues that "Respondents' continued detention burdens both Petitioner's interest in being raised by his parent and his mother's interest in caring for her child." (Petition at 22).

In the Answer, Respondents argue that Petitioner's mother's interest in raising him is "neither absolute nor unqualified," and that ORR has a countervailing interest in protecting Petitioner from risk of harm upon release, as required by 8 U.S.C. § 1232(c)(3)(A). (Docket No. 14 at 18). Respondents assert that there are sufficient procedural protections in place for Petitioner's mother to contest any ORR decision regarding his release. (Id.). However, Petitioner argues that (1) it is Respondents who are failing to comply with their own legal obligations, since Petitioner he has not been placed in the least restrictive setting that is in his best interest, *i.e.*, in the care and custody of his mother, and (2) he is facing indefinite and unlawful detention and family separation under the guise of careful deliberation of the sponsor determination process. (Petition at 22-23).

Here, F.M.D. has submitted a sponsorship application, and ORR is tasked with placing Petitioner in the least restrictive setting that is in his best interest under 8 U.S.C. § 1232(c)(2)(A). Petitioner is simply asserting a due process right to family unity to allow for reunification with his mother, something that ORR guidelines not only allows for, but prefers. See ORR Policy Guide, Section 2.2.1; see also Lucas R. v. Becerra, Case No. 2:18-cv-05741-DMG-BFM, 2022 WL 2177454, at *25 (C.D. Cal. Mar. 11, 2022) (analyzing whether a private interest exists under the *Mathews* balancing test and explaining that potential parent sponsors have the strongest interest in familial association); Santos, 260 F. Supp. 3d at 612; Beltran, 222 F. Supp. 3d at 482; J.E.C.M., 689 F. Supp. 3d at 197 ("The Court agrees with the reasoning of *Santos*, *Beltran*, and *Lucas*, and finds that the interest of family unity is implicated by ORR's reunification process as it applies to Category 1 and 2 sponsors, and finds that UCs and their proposed Category 1 and 2 sponsors share a constitutionally cognizable interest in family unity.").

/ / /

/ / /

In sum, the Court finds that Petitioner has established constitutionally cognizable private interests in freedom from detention and in family unity. Accordingly, the first Matthews factor weighs in Petitioner's favor.

*c. Risk of Erroneous Deprivation of Private Interest, Additional or Substitute Procedural Safeguards*

Petitioner contends that Respondents' delay in determining the suitability of F.M.D.'s sponsorship request and approval of her application has deprived him of his rights to freedom from confinement and family unity. (Petition at 21-22; see also Docket No. 15 at 10; Docket No. 24 at 5-6). Petitioner alleges that Respondents have failed to comply with the requirements of the TVPRA by promptly placing Petitioner in the least restrictive setting that is in his best interest – that being with his mother, the proposed sponsor. (Petition at 21).

Specifically, Petitioner argues that ORR has raised no concerns about F.M.D. as a sponsor – a parent, deemed to be a Category 1 sponsor under the ORR guidelines – and that ORR's own records indicate that F.M.D. does not present any risk of harm, abuse, maltreatment, exploitation or trafficking to Petitioner. Indeed, Respondents' comprehensive, 60-page Home Study, which thoroughly vetted not only F.M.D. but each member of her household as well as Petitioner, concluded that the reunification of Petitioner with his mother was appropriate, offering a positive recommendation (Docket No. 23-1 at 60).

The justification offered by Respondents for the continued detention of Petitioner and delay in reunification – to the extent it can be ascertained – appears to be concerns regarding Petitioner's safety. While such concerns reflect the statutory role of the ORR and are certainly admirable, they are at best vague when viewed through the facts of this case, and seem to be based entirely on the fact that Respondents' processes have not yet been completed, *i.e.*, the CA/N check and the DNA testing. Electing form over substance, however, ignores TVPRA's mandate

that the child be placed promptly into the least restrictive setting that is in the best interest of the child, and also ignores the extreme hardship and emotional harm being inflicted on Petitioner by his continued separation from his mother and family members, particularly in light of the positive information regarding reunification Respondents have already confirmed. As noted, Respondents have F.M.D.'s completed application, have obtained successful background checks – fingerprinting and criminal background checks – for F.M.D., S.Z.P. and every adult in the sponsor's household, all of which have come back clear of any concerning information. The social security numbers for the adult members of the household have likewise been provided and confirmed, and the income confirmation requirements have also been met. Petitioner's birth certificate has been provided, via the Mexican Consulate, establishing the maternal relationship between Petitioner and F.M.D. – which has not been questioned at any point in this process. Finally, the comprehensive Home Study has provided an exhaustive vetting of both the individuals in the sponsor's household, as well as the home itself, and has provided a description and explanation of the 2024 domestic incident, discussed in more detail, *supra*. Thus, Respondents' processes appear to have confirmed that unifying Petitioner and F.M.D. will be the least restrictive setting that ensures Petitioner's health and safety.

In the Answer, Respondents argue that several important vetting requirements remain outstanding, including the CA/N check, and that it does not have the information necessary to make a suitability determination regarding F.M.D. (Docket No. 14 at 23). While Respondents stated that the Home Study was outstanding, that report has since been completed, and contains a positive recommendation for reunification of Petitioner with his mother.

To the extent Respondents cite to their general concern regarding potential exploitation of unaccompanied minors by sponsors (id.), such argument is

inapplicable to the case at bar. There is no evidence in the record which points to any risk of exploitation of Petitioner by the reunification with F.M.D. To the contrary, Respondents' own Home Study has identified the significant emotional harm that Petitioner has incurred through his detention and separation from his mother. Respondents seem to ignore that aspect of Petitioner's safety and well-being, notwithstanding the statutory requirement that ORR consider placement that is in the best interest of the child.

Several courts have agreed that "significant" and "unexplained delay[s] in responding to [a proposed sponsor's] unification request" violates due process. See Lucas R., 2022 WL 2177454, at *27; J.E.C.M., 689 F. Supp. 3d at 197 ("The deprivations of plaintiffs' interests can therefore occur not just when ORR makes a final determination denying a reunification application, but also before making a final decision if there are prolonged, unreasonable delays in releasing a minor."); see also Maldonado v. Lloyd, Case No. 18-cv-3089, 2018 WL 2089348, at *1 (S.D.N.Y. May 4, 2018) (finding procedural process violation based where child and mother were separated for eleven months due to ORR's delay in processing mother's sponsorship application); Santos, 260 F. Supp. 3d at 613-14 (finding procedural due process violation where child and mother were separated for seventeen months due to ORR's delay in processing mother's sponsorship application); but see Beltran, 222 F. Supp. 3d at 486 (likely no due process violation based on "delay alone" when only two months passed between application submission and denial).

In Santos, the court granted immediate release of a seventeen-year-old Honduran citizen from ORR to the care and custody of his mother. Santos, 260 F. Supp. 3d at 600. Applying the Mathews balancing test, the court held that the child had a private interest in freedom from detention and family unification, and that "a more fulsome process … would considerably lessen the risk of erroneous deprivation." Id. at 612. The court was particularly troubled by the lengthy delay

in processing the mother's reunification request because it caused the child to wait—while in detention and away from his mother—for a period of seventeen months for a decision on his mother's sponsorship application and received no explanation for such delay. Id. at 613–14. During this time, the child's psychological condition worsened, which the court recognized was likely attributable in part to his prolonged detention and separation from his mother. Id. Ultimately, the Court concluded that "the very significant, unexplained delay in responding to the unification request" was "extremely troubling and conclud[ed] that the delay, even without other procedural deficiencies, violated due process." Id.

While the delay here is not as extreme as that in Santos, the same line of reasoning applies to this case. Petitioner is a 15-year-old Mexican citizen who seeks reunification with his mother. Petitioner has been in custody since January 15, 2026, a period of nearly eight months. Despite Petitioner's mother, F.M.D., taking the necessary steps to become Petitioner's sponsor shortly after he entered ORR custody in March 2026, there has been a lengthy delay in processing with little explanation as to why. See Santos, 260 F. Supp. 3d at 613–14.

Respondents have not explained why the additional processes or outstanding determinations are necessary to decide whether F.M.D. is a suitable sponsor for purposes of meeting the requirements of the TVPRA. Respondents have received F.M.D's sponsorship application, fingerprint results, and Home Study which favors Petitioner's placement with F.M.D. According to the ORR Policy Guide, a home study is defined as:

> An in-depth investigation of the potential sponsor's ability to ensure the child's safety and well-being initiated by ORR as part of the sponsor suitability assessment. A home study includes an investigation of the living conditions and standard of care that the unaccompanied alien child would receive if released and placed with a particular potential sponsor. The process includes interviews with the potential sponsor and other household members. A home study is conducted for any case

> where it is required by the TVPRA, mandated by ORR sub-regulatory guidance, and for other cases at ORR's discretion, including for those in which the safety and well-being of the unaccompanied alien child is in question. See UAC Policy Guide: Guide to Terms, https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-guide-terms [ ]). The purpose of a home study is to (1) "Assess the potential sponsor's ability to meet the child's needs;" (2) "Educate and prepare the potential sponsor for the child's release; and" (3) "Corroborate information gathered on the sponsor assessment." UAC Policy Guide, § 2.4.2. A home study includes interviews of household members, a home visit, and a written report regarding the case worker's findings. Id. The written report "may identify areas where additional services, resources, or information are needed to support a successful sponsorship" before placement. Id. "The final recommendation must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and identify any information that emerges regarding the sponsor, the sponsor's household or the child." Id.

Here, the Home Study has been completed for Petitioner's placement with F.M.D., which provides a positive recommendation for Petitioner's reunification with his mother. (Docket No. 23-1 at 60). The Home Study provides a comprehensive evaluation of Petitioner's health, both physical and mental, as well as of F.M.D.'s home environment and the other occupants, including her partner S.Z.P. (Docket No. 23-1, generally). As Petitioner notes in the Supplemental Brief, the Home Study references an incident that occurred in 2024 in which DFCS visited F.M.D.'s home after a report of a verbal altercation between F.M.D. and S.Z.P. (Docket No. 24 at 3). As a result of the visit by DFCS, S.Z.P. was required to attend a 10-week counseling session on marital communication and domestic violence, which he completed in May 2025. (Id.; Docket No. 23-1 at 18). During the home study visit, F.M.D. provided S.Z.P.'s certificate of completion of the 10-week counseling program to the investigator. (Docket No. 23-1 at 18). No charges were ever filed with respect to the incident, and DFCS closed its report with no further

concerns raised by the social worker. (Id. at 58). As repeatedly noted, the Home Study ultimately concluded with a positive endorsement.

Notwithstanding the significant body of information supporting Petitioner's placement with his mother, F.M.D., Respondents have refused to release Petitioner to his mother's custody, maintaining that the remaining vetting procedures – the CA/N check and DNA testing – are not completed. However, as Petitioner points out in the Supplemental Brief, ORR policies provide for Petitioner's release while these processes are pending (see Docket No. 24 at 4, citing ORR Policy Guide Section 2.5.2, which allows for ORR to release a minor while a CA/N check is pending if there are no significant child welfare concerns associated with a sponsor or anyone in the sponsor's home). Respondents only state that additional "vetting procedures" are being completed, which fails to comport with Petitioner's procedural due process rights. See E.H.C.F., 2026 WL 145229, at *12 ("[ORR's] vague explanation as to the delay—that additional vetting is required and that an 'investigation' as to safety concerns needs to be completed—does not comport with basic procedural due process.").

Accordingly, the Court finds a heightened risk of erroneous deprivation on the part of Petitioner regarding his interests in family unity and freedom from detention. Thus, the Court finds that the second Matthews factor also favors Petitioner.

*d. Government Interest, Fiscal and Administrative Burdens of Additional or Substitute Procedures*

In the Answer, Respondents appear to argue that their interest for purposes of the third Matthews factor is generally to safeguard the release of minors in their care, and to particularly ensure that sponsors are not allowed the opportunity to exploit them. (Docket No. 14 at 23). It is undisputed that the government has a significant interest in ensuring it only releases an UAC when consistent with its statutory

mandate, along with protecting Petitioner and the community. However, Respondents have failed to identify any facts that indicate Petitioner's safety would be compromised in any way by his release to his identified sponsor, F.M.D., his mother, and Respondents have not identified any burden that would be imposed if ORR releases Petitioner to his mother pending the completion of the remaining vetting processes.

In light of the weight of the data supporting Petitioner's reunification with his mother, particularly the positive home study recommendation, the government has failed to indicate the fiscal or administrative burdens of Petitioner's release to his mother. Therefore, the third Matthews factor weighs in favor of Petitioner.

All three of the Mathews factors weigh in Petitioner's favor. Petitioner's procedural due process rights have been violated due to his prolonged detention attributable to the delay in releasing Petitioner to his F.M.C.'s custody, thereby warranting habeas relief. See Maldonado, 2018 WL 2089348, at *1 (finding procedural due process violation and granting habeas relief under 28 U.S.C. § 2241 with order to immediately release child to custody of his mother); Santos, 260 F. Supp. 3d at 600 (same); A.N.P.S., 2025 WL 3707333, at *1 (finding procedural due process violation and granting habeas relief under 28 U.S.C. § 2241 with order to immediately release child to custody of his adult cousin).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IV.**

**ORDER**

The Court hereby GRANTS Petitioner's Petition for a Writ of Habeas Corpus. The Court ORDERS Respondents to immediate release Petitioner I.R.L.M. (A# 221-419-037) to the custody and care of his mother, F.M.D. The Court ORDERS the parties to file a joint status report by the close of business on September 3, 2025, confirming Petitioner's release.

DATED: September 2, 2026

DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE